Filed 8/1/16  Marriage of Jones-Geeting and Geeting CA4/3
Opinion following rehearing

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re Marriage of ELLA JONES-GEETING and STEVEN C. GEETING. | |
| ELLA JONES-GEETING, | G050989 |
| Appellant, | (Super. Ct. No. 11D011705) |
| v. | O P I N I O N |
| STEVEN C. GEETING, | |
| Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Clay M. Smith, Judge.  Affirmed in part and reversed and remanded in part.

Law Offices of Burch, Coulston, & Shepard and Todd P. Coulston for Appellant.

Law Offices of Saylin & Swisher, Brian G. Saylin, Lindsay L. Swisher and Daniela A. Laakso for Respondent.

Appellant Ella Jones-Geeting (Ella)[1] appeals from a judgment of dissolution of her marriage to Steven Geeting (Steven), raising three issues. She claims there was insufficient evidence to support the almost $206,000 awarded to Steven as a reimbursement for his separate property contribution to purchase the family residence; the court should have retroactively modified temporary spousal support; and the court improperly failed to divide certain referral fees earned by Steven, who is a lawyer.

After a grant of rehearing on this issue, we remand for the court to determine the net amount, if any, of $40,000 in referral fees Steven earned and divide such amount between the parties. Otherwise, we affirm the judgment.

In addition to disputing Ella's contentions, Steven argues she impliedly waived her right to appeal by accepting the benefits of the judgment. Without deciding this claim, we decide the appeal on the merits.

## FACTS AND PROCEDURAL HISTORY

The parties married in 2003 and separated in December 2011. After the dissolution action commenced, the court ordered Steven to pay Ella $3,000 per month for temporary spousal support. The court retained jurisdiction to modify the order retroactive to January 2012 when the support commenced.

During the marriage the parties purchased a residence (Residence). There was approximately $200,000 paid for the down payment plus an additional payment for closing costs.[2] Ella claimed she made a $10,000 payment from her separate property toward the down payment.[3] She also stated she paid almost $206,000 from the parties' joint account (Account).

---

[1] For clarity, and not out of disrespect, we use the parties' first names.

[2] The record is not clear about the exact amount with testimony about payments of $208,000 and $200,000.

The parties both testified they deposited separate property into that Account. Ella testified she deposited $99,000 in separate funds. However she also stated did not know exactly how much she had put into the Account. She later said she had not received the funds prior to the purchase of the Residence.

In her deposition Ella had testified she did not know how much, if any, of the $208,000 paid into escrow was from her separate funds. When asked if she disagreed with Steven's statement he paid approximately $200,000 of the down payment, she had "no comment." She also testified the only information she had showing she had paid separate property for the down payment was her $10,000 payment. In requests for admission she could not admit whether or how much of the funds in the Account were Steven's separate property and stated she had no records that would inform her.

Steven testified he received approximately $208,000 from the proceeds of the sale of his separate property. He had deposited those into a separate bank account. Steven did not remember ever transferring the funds into the Account. If the money was transferred, the Account was being used only as a holding account for convenience.

Steven's records from the year the house was purchased showed all that information but those records had been destroyed. The parties had maintained a storage unit for the duration of the marriage. Steven stored his client files there. In addition, all the parties' records were there, including their mortgages and loan applications. Shortly after the parties separated, Steven attempted to enter the unit but he was unable to do so. The manager told him Ella had changed the pass code and Steven had no legal right to enter the unit.

After Steven worked out an agreement with Ella's lawyer, he entered the unit, where two sheriff's deputies were present. Ella had rearranged the contents, putting

---

[3] In support of this claim and other arguments Ella refers to a trial exhibits. Because no trial exhibits were designated, they are not part of the record on appeal and we cannot consider them.

his law firm records on one side. Everything else was on the other side, including two years of boxes of tax and related documents. A sheriff told him those were Ella's property and he would be arrested if he tried to take anything. The sheriff refused Steven's request to look in a tax box to see if documents were in Steven's handwriting. The records for the Residence were in one of those two boxes.

Ella testified she told the storage company not to allow Steven inside the unit. She also asked the sheriffs to be present when he came to remove his property. After that event she twice moved the contents to other locations, ultimately to Arizona. As a result of a fire in the Arizona unit, all of the property, including the Residence records, was destroyed.

Steven had tried and been unable to obtain documents verifying the payment from the real estate agent who handled the purchase and sale, the escrow company, and the bank; all had been destroyed.

Steven testified Ella agreed to pay $200,000 toward the down payment. She did not have the funds available but said she would contribute once she sold one of her properties. She never paid any sums. Steven testified unqualifiedly he had not made a gift of the down payment funds to the community.

Ella's expert, Joel Danenhauer, a certified public accountant, testified that contrary to the monthly income of $16,188 shown on Steven's income and expense declaration used for temporary support, his actual income in 2012 was $24,156 per month, excluding referral fees. It was $30,738 per month if referral fees were included. His average monthly income in 2013 was $21,677. Danenhauer also testified that based on that data, Steven owed $48,704 as retroactive temporary support.

The parties stipulated Steven's law practice was his separate property. As part of his practice he referred cases to other lawyers from time to time. Fees for two

4

cases referred during the marriage, one for $40,000 and another for $80,000,[4] were not paid until after separation.

Danenhauer testified the referral fees, less 40 percent deducted for taxes, should be divided between the parties. The court inquired as to why taxes would not be paid on his net revenue after his overhead was deducted. Danenhauer agreed that is what the IRS would consider to be earned income. When the court asked why that would not be the amount to be divided, Danenhauer replied overhead would have been paid in the year the cases were referred. The court was of the opinion Steven incurred a cost to generate the fees.

Steven testified that when he received the $80,000 referral fee, he paid $40,000 to the IRS and Franchise Tax Board for 2011 income. The balance went to two months' overhead.

At the conclusion of trial in May 2014, the court issued a lengthy and detailed statement of decision.[5] Preliminarily the court made some general findings. First, it noted the testimony as to some of the issues was noticeably in conflict. The court stated it resolved those conflicts in the evidence "in a manner consistent with the findings of fact" set out in the statement of decision.

Second, as to the bulk of parties' financial records Ella was to maintain in a storage facility, she neither properly protected them nor allowed Steven access. The court primarily resolved any factual issues that could have been explained by those records against Ella.

---

[4] Although Steven testified to this amount, at some point during the questioning the court referred to the amount as $78,000, and some of the testimony used that number. For clarity we will refer to it as $80,000.

[5] While there were several issues decided, we confine our recitation of the findings to those pertinent to the three issues on appeal.

At the time of trial, Steven was paying $3,000 for temporary spousal support. He sought to reduce it to $1,000 per month for the next12 months at which time it would end. Ella wanted support to be raised to $5,400 per month, retroactive to January 2012. The court found the parties' standard of living was upper middle class, but, based on their income, they could not sustain it.

Steven had average monthly income of $16,300. He also had an annuity that would pay $1,000 per month for 52 months and approximately $20,000 for retirement. He was 64 years old with substantial health problems and reasonably expected and probably needed to semi-retire and work as a mediator by the time he reached age 65. He was winding down his law practice. In addition he had substantial debt, approximately $150,000.

Ella received $2,896 from a tax-free state disability payment. She also received about $1,300 annually from a trust but no other liquid assets. She had equity of $130,000 to $180,000 in a piece of separate real property. Her debt was about $37,000. Ella was age 54 and had a bachelor's degree and licensed vocational nurse certificate. Although she had some health problems, she had the ability and qualifications to work. The court found she should be doing so, and was not making reasonable efforts. The court did not believe her testimony she was physically unable to work. In fact, it found she might be using her current unemployment as a basis for either a pending claim against an employer or for her request for increased spousal support.

The court found both parties' needs were substantially more than their combined income could accommodate. Steven needed about $20,000 per month to preserve his marital standard and to pay both his significant debt load and spousal support. Steven could not currently pay enough to allow Ella to live at the marital standard of living. With his anticipated retirement in a year, his ability would be even less. He would be unable to pay even the amount of support he had been paying.

6

Ella needed a minimum of $8,000 per month to maintain the marital standard of living. Based on her not quite $3,000 disability payment, she had a $5,000-plus monthly shortfall. The court found the parties had expended any resources they may have had to preserve their marital standard of living on attorney fees in the litigation.

After considering all of the factors required by Family Code section 4320, the court ordered Steven to pay to Ella spousal support of $3,000 per month for one year, beginning July 2015, at which time he would be 65. This would give Ella an additional year to find employment. Spousal support would then be reduced to $1,500 per month for eight months, during which time Steven would become semi-retired and Ella should have a full-time job. After that, spousal support would terminate, Steven having paid support for one-half the length of the marriage.

The court ruled the permanent support award was "consistent with the amount of temporary spousal support, [so] there is no issue of retroactivity." The court found Ella had not proved support was in arrears.

The parties also disputed the amounts they had contributed to the down payment on the Residence. The court found Steven gave detailed testimony he had contributed separate property in the amount of $205,679. Thus he was entitled to reimbursement of that amount pursuant to Family Code section 2640.

The court also ruled Ella had not met her burden of proof to show she made any contribution. It found her testimony was "vague" and not credible. Nor did she provide sufficient evidence of any kind to show she paid any part of her separate property toward the down payment. As a result, she was not entitled to any reimbursement.

Regarding the referral fees earned by Steven in his law practice, the court found that after the parties separated he was paid $120,000 for cases that were begun before separation. The court acknowledged any fees for Steven's work during the marriage were community property but found they were gross fees and "[came] into [the] law practice as revenue." Payment of overhead had to be deducted before the remainder

7

would be considered income that could be divided between the parties. The court was not persuaded by the contrary testimony of Ella's expert. There was no evidence as to the amount of the fees earned before separation or the amount that could be considered income. Therefore, the court refused to allocate any portion of the referral fees to Ella.

Ella filed objections to the statement of decision. As to the prospective spousal support and the discrediting of her testimony that she was unable to work due to her physical condition, she argued the court failed to consider she was overseeing repair work on one of the parties' pieces of residential property and had looked for 11 months but had not been able to find work in Bullhead City where she was residing. She also asserted it was difficult to find employment at her age.

In addition, she pointed out that although Steven was near 65, he continued to work fulltime and the evidence he was going to retire was only speculative. Further, the court had relied on Steven's debt in calculating his ability to pay but did not "appear" to consider the parties had agreed to individually pay the debts in their own names, with Ella paying a $30,000 equalizing payment. Moreover, she argued, the community had already paid the tax showed owing on Steven's income and expense declaration.

Ella further maintained the court's decision as to future spousal support did not mean the court was prohibited from modifying temporarily spousal support retroactively. Since the court ordered Ella was not entitled to any of the referral fees, Steven had more income than the temporary support order considered and that was sufficient to modify the amount.

As to the contributions for the down payment on the Residence, Ella asserted Steven had not met his burden of proof to trace the funds. He did not "establish with certainty" that the documents on which he relied were destroyed in the fire. Nor did he alternatively prove that when the down payment was made, there was no community income.

8

Finally, as to the referral fees, she noted Steven's testimony that all of the work done to earn the fees was during the marriage, and there was no evidence of overhead, which was his burden to prove. She challenged the court's disregard of her expert's testimony, arguing it did not relate to the referral fees.

The court overruled Ella's objections and explained the statement of decision was a fair determination of its findings as to the ultimate facts and issues and Ella's objections were in actuality a disagreement with its findings.

As to a retroactive increase of the temporary spousal support, the court explained it had relied on the entire record, including Ella's breach of duty by failing to keep community records safe, her refusal to allow Steven to examine them, and her removal of personal property, both community and Steven's separate property, from the Residence. It also pointed to Ella's failure to attempt to obtain employment and to show she needed increased temporary spousal support.

Regarding the Residence, the court again observed Ella's objections were merely objections to its evidentiary findings. The court reiterated Ella had not met her burden of proof. Her testimony was not credible while Steven's was.

Finally, the court noted there was no evidence for it to decide how much of the referral fees were revenue as opposed to income and how much was a community asset. The court refused to rely on assumptions to make such a determination.

## DISCUSSION

*1. Funds to Purchase Residence*

Ella argues the evidence is insufficient to support an award of roughly $206,000 to Steven to reimburse him for the down payment on the Residence. She again claims he did not meet his burden to trace the source of the funds. We use a substantial evidence standard of review and do not conduct a de novo review as Ella asserts.

In determining the sufficiency of the evidence we must "accept as true all evidence tending to establish the correctness of the findings of the trial court, resolve all

9

conflicts in the evidence in favor of the prevailing party, and indulge all legitimate and reasonable inferences to uphold the judgment." (*In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 49-50, fn. omitted.) We do not reweigh evidence or redetermine credibility. (*In re Marriage of Hill & Dittmer* (2011) 202 Cal.App.4th 1046, 1051-1952.)

Ella argues the evidence shows she deposited $99,000 of separate funds into the Account. Thus, she claims the Account held commingled money requiring Steven to trace the almost $206,000 down payment to show it was his separate property.

But Ella ignores the court's finding Steven's "testimony with respect to financial matters was detailed and credible; [Ella's] was not." Further, her testimony was "vague" and not supported by any other evidence. In short, the court did not believe her testimony she deposited $99,000 into the Account. As a result, there is no evidence the Account contained commingled assets, requiring any tracing.

But even had there been sufficient proof of the $99,000 deposit, our review of the record shows substantial evidence Steven made the roughly $206,000 down payment with his separate funds. He testified he made the down payment from the $223,000-plus proceeds he received from the sale of his separate property and deposited them into a separate property account. He could not remember how the funds were transferred to escrow because he did not have records to refresh his memory. If his separate property funds somehow made it to the Account, it was merely for convenience and not because he intended to make a gift to the community.

Citing *In re Marriage of Frick* (1986) 181 Cal.App.3d 997, 1011, Ella stresses that to trace the funds, Steven had to provide written records and his testimony alone was insufficient. She also contends the court never made a finding she prevented Steven from doing so. These arguments are remarkable, given the evidence Steven did keep those records and the court's findings Ella denied Steven access to the records and failed to keep them safe, leading to their destruction.

10

Further, Ella completely fails to mention these facts and findings, in violation of her duties as an appellant. "'[W]hen an appellant urges the insufficiency of the evidence to support the findings it is [her] duty to set forth a fair and adequate statement of the evidence which is claimed to be insufficient.'" (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.) Based on this failure alone we could consider the issue forfeited. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.) Even on the merits, this disingenuous argument fails because it was her fault Steven did not have the necessary records she proclaims he was required to provide.

*2. Temporary Spousal Support*

Ella complains the court did not increase her temporary spousal support retroactively. She contends the court ignored her expert's "undisputed testimony." More specifically, she argues the court did not consider either her needs or Steven's ability to pay, and failed to articulate any valid reasons for denying her request. We disagree.

The court has broad discretion in ordering temporary spousal support. (*In re Marriage of Wittgrove* (2004) 120 Cal.App.4th 1317, 1327.) The order will not be reversed without evidence of a clear abuse of discretion. (*Ibid*.) "Generally, temporary spousal support may be ordered in 'any amount' based on the party's need and the other party's ability to pay. [Citations.]" (*Ibid*.) "'[T]emporary spousal support "is utilized to maintain the living conditions and standards of the parties in as close to the status quo position as possible pending trial and the division of their assets and obligations." [Citations.]' [Citations.]" (*Ibid*.)

The court may retroactively modify temporary support. (*In re Marriage of MacManus* (2010) 182 Cal.App.4th 330, 335.) The factors on which the court may make such an order are the same as those forming the basis of the original order: need and ability to pay. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 312-313.)

The statement of decision contained an analysis of the factors on which it relied to determine permanent spousal support. This included the finding the parties had

11

"an artificially high and unsustainable standard of living" based, in part, on "infusions of cash from each spouse from other sources" and "unsustainable cash flow." The court also found Steven's earning capacity was insufficient to support the marital standard of living, and Ella had both the capacity and qualifications to work and should be working.

The court further stated the amount of permanent support was "consistent with the amount of temporary spousal support, [and thus] there is no issue of retroactivity." This was an adequate explanation to justify the court's exercise of discretion not to retroactively modify temporary spousal support.

In addition, the minute order denying Ella's objections to the statement of decision lists several additional reasons for that decision. These included Ella's breach of duty in refusing to allow Steven access to their financial records, failure to safely maintain them, and improper removal of them; her failure to seek employment; and her failure to demonstrate need for increased support.

Finally, even if Danenhauer's testimony was undisputed, the court was under no obligation to believe it. It decides the question of credibility. (*In re Marriage of Hill & Dittmer*, *supra*, 202 Cal.App.4th at pp. 1051-1952.) The court did not err.

## 3. *Referral Fees*

Finally, Ella argues the court should have equally divided the $120,000 in referral fees because they were community property. The court found those fees were for work begun prior to separation, and to that extent, they were community property. The court also found the net amount of the fees after payment of overhead was income "subject to division between the parties." But the court was not persuaded by the testimony of Danenhauer, Ella's expert, as set out above, as to how the fees should be divided. Further there was no evidence as to the amount of fees earned before separation or the amount that would be true income rather than gross revenue. The court concluded there was no basis to award any portion of the fees to Ella.

Although Steven did testify he referred the cases during the marriage and that was the only work he performed on them, we found nothing in the record to support Ella's claim all the overheard associated with the referred cases was incurred during the marriage. Moreover, the scant evidence she cites, i.e., that the amount of fees was "pre-tax," was based solely on Danenhauer's testimony, which the court discounted.

And there was contrary evidence. Steven testified that when he received the $80,000 fee, he sent more than $40,000 to the IRS and Franchise Tax Board for 2011 taxes. The balance went to two months' overhead. This testimony was substantial evidence which supports the court's finding, at least as to the $80,000 fee.

The $40,000 fee is a different story. Steven argues the referral fees were not community property at all, but rather his separate property, based on the stipulation the law practice was his separate property. This challenge fails for two reasons. First, he did not appeal the finding and has no right to raise this issue. (*Estate of Powell* (2000) 83 Cal.App.4th 1434, 1439 [generally, "'a respondent who has not appealed from the judgment may not urge error on appeal'"].)

Second, even on the merits, the law does not support his claim. Steven relies on section 770 that defines separate property as "[a]ll property owned by the person before marriage" and "[t]he rents, issues, and profits of the property described in this section." (§ 770, subd. (a)(1), (3).) But despite this seemingly unqualified language, case law has not interpreted the section so broadly.

Income resulting from a party's "skill, efforts and industry is community property" and "the community should receive a fair share of the profits which derive from the husband's devotion of more than minimal time and effort to the handling of his separate property. [Citations.]" (*Beam v. Bank of America* (1971) 6 Cal.3d 12, 17.) The court's finding the fee was community property was supported by substantial evidence and thus is binding. (*Id.* at p. 25.)

13

Steven argues he had the right to rely on the stipulation that the practice was separate property and had no way of anticipating the court would ignore it. Based on applicable law, the court did not ignore the stipulation. In the interests of justice, however, we remand to the trial court so Steven may have the opportunity to present evidence that he incurred costs to generate the fees, including overhead and paid any taxes on those fees. If he proves any such costs, the amount should be deducted from the $40,000 fees. The balance, if any, should be equally divided between the parties.

## DISPOSITION

The judgment is reversed and remanded to the court to determine the net amount, if any, of the $40,000 referral fee. If there is any net amount, it shall be divided between the parties. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.


THOMPSON, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.

14